RECEIVED
AUG 2 1 2015
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 3:15-cr-17 |
| v. | ) | **PLEA AGREEMENT** |
| | ) | |
| JAIME JACQUEZ MORAN, | ) | |
| Defendant. | ) | |

The United States of America (also referred to as "the Government") and the defendant, JAIME JACQUEZ MORAN, and Defendant's attorney, enter into this Plea Agreement.

## A. CHARGES

1. *Subject Offense.* Defendant will plead guilty to the lesser offense of Count 1 which charges conspiracy to manufacture, distribute, and possess with intent to distribute 100 kilograms and more of marijuana, a violation of Title 21, United States Code, Section 846, 841(a)(1), and 841(b)(1)(B).

2. *No Further Prosecution.* The Government agrees that defendant will not be charged in the Southern District of Iowa with any other federal criminal offense arising from or directly relating to this investigation. This paragraph and this plea agreement do not apply to (1) any criminal act occurring after the date of this agreement, (2) any crime of violence, and (3) any criminal offense which defendant did not fully disclose to law enforcement during defendant's interviews pursuant to any proffer or other agreements with the United States.

1

## B. MAXIMUM PENALTIES

3. *Maximum and Mandatory Minimum Punishment.* Defendant understands that the crime to which he is pleading guilty in Count 1 carries a mandatory minimum sentence of five (5) years in prison and a maximum sentence of forty (40) years in prison; a maximum fine of $ 5,000,000; and a term of supervised release of four years (4) years up to forty (40) years. Defendant understands that the Court may not impose a sentence less than the mandatory minimum sentence. No one has promised Defendant that Defendant will be eligible for a sentence of less than the mandatory minimum. A mandatory special assessment of $100 per count also must be imposed by the sentencing court.

4. *Supervised Release--Explained.* Defendant understands that, during any period of supervised release or probation, defendant will be under supervision and will be required to comply with certain conditions. Defendant understands that should he violate a condition of supervised release, he could be sentenced up to three (3) years in prison, without any credit for time previously served.

5. *Detention.* Defendant agrees that he will remain in the custody of the United States Marshal following the completion of the entry of his guilty plea to await the imposition of sentence.

## C. NATURE OF THE OFFENSE – FACTUAL BASIS

6. *Elements of drug conspiracy understood.* Defendant understands that to prove the offense alleged in Count 1, conspiracy to manufacture, distribute and possession with intent to distribute 100 kilograms and more of marijuana, the

2

Government must prove beyond a reasonable doubt the following elements:

>(a) On or between the dates identified in the indictment, two or more persons reached an agreement or came to an understanding to manufacture, distribute or possess with intent to distribute controlled substances;

>(b) the defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect;

>(c) at the time the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding was to manufacture, distribute or possess with intent to distribute controlled substances; and

>(d) the defendant's conduct, which includes the reasonably foreseeable conduct of other members of the conspiracy, charged and uncharged, involved at least 100 kilograms of marijuana.

7. *Elements Admitted.* As a factual basis for his plea of guilty, defendant admits the following:

>(a) By sometime in 2012, or earlier, Jaime Jacquez Moran reached an agreement and came to an understanding Inocente Chavez Saenz, Guillermo Garcia, Salvador Garcia and others that they would manufacture, distribute and possess with intent to distribute marijuana. The conspiracy involved more than 100 kilograms of marijuana.

>(b) By August of 2012, agents of the DEA and the FBI developed an informant who was able to infiltrate the conspiracy and purchase marijuana directly from Guillermo Garcia, Salvador Garcia, Jaime Jacquez Moran and Inocente Chavez Saenz. On August 10, 2012, the informant traveled to the residence of Guillermo Garcia in West Liberty, Iowa and met with Salvador and Guillermo. Garcia's residence was being used by Jacquez Moran and others as a storage location for shipments of marijuana. While in the garage of the residence, Guillermo Garcia showed the informant the rear area of the garage where marijuana was stored along the wall from the floor to the ceiling. It was expected to bring over $600,000.00 in sales. Guillermo Garcia advised that his partners were in Mexico putting together the next shipment. They were looking for people who wanted to purchase 50 to 100 pounds at a time in order to sell the marijuana quickly.

3

(c) On September 7, 2012, the informant arranged to meet with Guillermo Garcia at his home in West Liberty. While at the residence, the informant was introduced to the defendant, Jaime Jacquez Moran, and Inocente Chavez Saenz. During conversations that followed, Inocente Chavez Saenz asked the informant if he wanted to look at the marijuana. The garage door was then closed and the Chavez Saenz showed the informant a small "brick" of marijuana. The informant and Chavez Saenz discussed the price and quantity he wanted to purchase. The informant said he wanted 50 pounds and Chavez Saenz said the price would be $700.00 per pound or $35,000.00 for the 50 pounds. They agreed and Chavez Saenz pulled out a blue plastic tote/bin that was located in the garage, opened the tote, and began pulling out "bricks" of marijuana; each brick weighed between 2 pounds 10 ounces and 2 pounds 11 ounces.

(d) While the informant was in the residence, agents observed a black Lexus, model 400, four (4) door sedan, bearing Iowa license plate arrive and pull into the driveway. Someone get out of the car and approached the residence. A short time later, agents observed the same person approach the Lexus, place a package into the trunk, and then enter the vehicle. Then the vehicle backed out of the driveway, and proceeded to Highway 6 and then to Interstate 80. The vehicle was stopped by Coralville police. A canine gave a positive indication on the car and officers searched and found approximately two pounds of marijuana in the trunk of the vehicle.

(e) While at the residence, the informant was told that someone had come to the residence earlier and picked up 80 pounds of marijuana and that they had received a total of 300 pounds of marijuana from Denver, Colorado and that once the money was collected, they would return to Colorado and bring back an additional 300 pounds. They said the organization intends to bring 300 pounds into West Liberty every week to two weeks. The informant was also told that if everything went well, they may attempt to bring in a 1,000 pound shipment. The informant left the residence and drove directly to meet with agents at approximately 8:50 p.m.

(f) On November 2, 2012, the informant drove to the Garcia residence in West Liberty, Iowa. While there, Inocente Chavez Saenz and Jaime Jaquez Moran arrived at the residence in a green colored Nissan Armada with Iowa license plates. They stayed for a while and spoke with the informant concerning the purchase of marijuana. Inocente Chavez Saenz offered to front 60 pounds of marijuana to the informant and offered to give the informant a week and a half to pay for it. This 60 pounds was all that was left over from the last 300 pound shipment of marijuana.

(g) On November 9, 2012, the informant had arranged for the Garcias to front marijuana to him. In anticipation of the delivery, agents conducted surveillance of the Garcia residence in Muscatine County and observed Salvador and

Guillermo Garcia leave the residence and get into a 2001 GMC Yukon. They proceeded east on Interstate 80. The vehicle was subsequently stopped by the Iowa State Patrol on eastbound I-80, near mile post 278. Both Salvador and Guillermo Garcia were placed under arrest by the Iowa State Patrol. A search of the vehicle led to the discovery and seizure of approximately 36 pounds of marijuana which was located inside a duffel bag in the vehicle.

(h) On Friday, November 30, 2012 at approximately 9:00 p.m., Salvador Garcia, Inocente Chavez Saenz and the defendant, Jaime Jaquez Moran, met with the informant. Inocente Chavez Saenz said that since Guillermo and Salvador had gotten arrested and had a lot of heat on them, the group wanted the informant to step up and move multiple pounds of marijuana for the group. The defendant and Chavez Saenz told the informant they owed their supplier about $40,000.00 from the previous shipment and as soon as that debt was paid, they were to receive another 400 to 500 pound shipment. The defendant said the informant needed to help Salvador out of his $15,000.00 debt that was incurred when Salvador got arrested with the 36 pounds of marijuana. As a result of the arrest, the group was using a new stash house. The informant told them that he didn't have that kind of money right now but would try to put something together to get things moving again. Chavez Saenz told the informant that they would be calling in the next few days to collect some money.

(i) On December 19, 2012, the informant met with Salvador Garcia, Jaime Jaquez Moran, and Inocente Chavez Saenz. At that time another cooperating individual was introduced to Garcia, Jaime Jaquez Moran, and Inocente Chavez Saenz by the informant. During this meeting, the informant paid $5000.00 of DEA official funds to be applied to the "debt." This meeting took place in the parking lot of Best Buy at the Coral Ridge Mall in Coralville, Iowa. The second informant was introduced to members of the conspiracy to act as a purchaser of 100 pound quantities of marijuana as well as kilogram quantities of cocaine. The initial informant was told that the organization was going to receive a shipment of marijuana in the next 15 days and that if the second informant provided them with an additional $5000.00, the organization would front 100 pounds of marijuana to him. The informant showed Chavez Saenz a "trap" car that was provided to the group. Chavez Saenz told the informant that he and the defendant currently owed the marijuana supplier in Colorado $40,000.00 from when Salvador and Guillermo Garcia got arrested. The defendant, Jaime Jaquez Moran, told the informant that Chavez Saenz was trying to develop ties to a different supplier for marijuana in Denver, Colorado because the group they had been working with was too violent.

(j) The trap car remained in the area of the Bon-Air Mobile Home Park in Iowa City until January 2, 2012. At approximately 2:11 p.m., the trap in the trap car was activated. At approximately 3:25 p.m., the trap car left the mobile home

park and traveled to Columbus Junction, Iowa and parked in the area of 3rd Street between Ash Street and Cherry Street. Columbus Junction Police Chief Donald Orr found the vehicle parked outside of the garage located behind the residence of Irma Delreal and Jose Rodriguez who are the parents of the defendant's wife, Maritza Rodriguez. While the vehicle was parked there, agents received another alert indicating that the trap had opened and shut once again around 8:00 p.m.

(k) Between January 2, 2013 and January 5, 2013, the vehicle was tracked electronically and made several trips between Columbus Junction, Iowa, and several other locations including various locations in Muscatine, Iowa.

(l) On May 2, 2013, agents proffered a cooperating defendant (CD) from Burlington, Iowa. CD identified Innocent Chavez Saenz and the defendant, Jaime Jaquez Moran, as persons from whom he had purchased marijuana. CD got 165 pounds on their first big transaction. The second was 220-250 pounds. Then 110 pounds. Thereafter they contracted for 150-pound loads (or bigger) at least 8 to 10 times. When CD got raided he called the defendant, Jacquez Moran, and told him he wanted to return the marijuana he just got so he would not get caught with it or owe money for it. The defendant retrieved it. At the time of the proffer, CD still owed the defendant $15,000.

(m) On Tuesday, May 21, 2013, CD made a payment of $3,000 to Inocente Chavez Saenz and the defendant, Jaquez Moran, for a previous drug debt for fronted marijuana. This took place in Burlington, Iowa.

(n) On June 7, 2013, the defendant, Jaime Jacquez Moran, visited the informant and told him that another shipment had arrived. The defendant offered to sell 50 pounds of marijuana to the informant for $675 per pound.

(o) On June 18, 2013, CD received a free sample of marijuana directly from the defendant, Jaime Jaquez Moran. In a recorded telephone call the defendant said he would drive to Burlington and provide a free sample. He said he had 60 pounds left. The defendant was observed by surveillance officers when he arrived at the Menards Store in Burlington to meet with CD. CD had a recording device at the time. After the meet, CD provided the marijuana sample to agents.

(p) On July 31, 2013, the defendant met with the informant and said he had about 80 pounds of marijuana left from his last shipment and offered it to the informant. The informant told the defendant he and his partner had just gotten two kilograms of cocaine and were still working with that. The defendant said he would charge only $550 per pound for the marijuana. The defendant said the organization had just lost 10,000 pounds of marijuana when it was seized by police in Indianapolis. The defendant said Inocente Chavez Saenz was in New Mexico.

He said they work for LaLinea of the Juarez Cartel. The defendant told the informant they no longer trusted Salvador and Guillermo Garcia after they were stopped with marijuana because they were not charged with it.

(q) On September 18, 2013, the informant was contacted by Inocente Chavez Saenz who told the informant a new shipment of marijuana was arriving. Arrangements were made to purchase some marijuana in Iowa City. A controlled purchase was conducted starting at the Bo James Restaurant in Iowa City. Chavez Saenz said he had 200 pounds and agreed to set aside 25 pounds of marijuana for the informant; he could pick it up the following day. The informant agreed to pay $8,000. The following day, September 19, 2013, the informant picked up 25 pounds of marijuana from the defendant, Jaime Jaquez Moran, in Iowa City. The informant called the defendant and Chavez Saenz to find out when and where to meet. They told him to meet at the Wildwood Steakhouse at exit 249 (I-80) in Johnson County. Agents observed the defendant's arrival and observed him meet with the informant in the parking lot. After the defendant left, the informant turned over 8 bricks of marijuana to agents.

8. *Truthfulness of Factual Basis.* Defendant acknowledges that the above statements are true. Defendant also understands that, during the change of plea hearing, the judge and the prosecutor may ask him questions under oath about the offense to which he is pleading guilty, in the presence of defendant's attorney. Defendant understands that he must answer these questions truthfully, and that defendant can be prosecuted for perjury if that defendant gives any false answers.

9. *Venue.* Defendant agrees that venue for this case is proper for the United States District Court for the Southern District of Iowa.

**D. SENTENCING**

10. *Sentencing Guidelines.* Defendant understands that his sentence will be determined by the Court after considering the advisory United States Sentencing Guidelines, together with other factors set forth by law. The Sentencing Guidelines establish a sentencing range based upon factors determined to be present in the

case, which include, but are not limited to the following:

(a) *the type and quantity of drugs involved in the offense*; the defendant admits that between the dates alleged in the indictment he obtained and distributed more than 100 kilograms of marijuana the exact amount of drugs to be attributed to him (above the amount admitted here) will be determined by the court at the time of sentencing based upon U.S.S.G. § 1B1.3;

(b) *maintaining a premises*, the parties have reached no agreement concerning whether the defendant maintained a premises for the purpose of manufacturing or distributing controlled substances within the meaning of USSG § 2D1.1(b)(12);

(c) *Defendant's role in the offense*, the parties have reached no agreement concerning whether the defendant played either an aggravating role or a mitigating role in the subject offense within the meaning of USSG §§ 3B1.1 and 3B1.2;

(d) *the nature and extent of Defendant's criminal history* (prior convictions), the defendant understands that his criminal history will be investigated to determine his Criminal History Category under the Federal Sentencing Guidelines;

(e) *acceptance or lack of acceptance of responsibility.*

Defendant understands that, under some circumstances, the Court may "depart" or "vary" from the Guidelines and impose a sentence more severe or less severe than provided by the Guidelines, up to the maximum in the statute of conviction. Defendant has discussed the Sentencing Guidelines with his attorney.

11. *Acceptance of Responsibility.* The government agrees to recommend that Defendant receive credit for acceptance of responsibility under USSG § 3E1.1. The government reserves the right to oppose a reduction under § 3E1.1 if after the plea proceeding the defendant obstructs justice, fails to cooperate fully and truthfully with the United States Probation Office, attempts to withdraw his guilty plea, or

otherwise engages in conduct not consistent with acceptance of responsibility. If the base offense level is 16 or above, as determined by the Court, the government agrees that defendant should receive a 3-level reduction, based on timely notification to the government of the defendant's intent to plead guilty.

12. *Presentence Report.* Defendant understands that the Court may defer a decision as to whether to accept this plea agreement until after a Presentence Report has been prepared by the United States Probation Office, and after defendant's attorney and the Government have had an opportunity to review and challenge the Presentence Report.

13. *Evidence at Sentencing.* Defendant, Defendant's attorney, and the Government attorney will be permitted to make whatever comment and evidentiary offer they deem appropriate at the time of the guilty plea, sentencing, or any other proceeding related to this case, provided such offer or comment does not violate any other provision of this agreement. The parties are also free to provide all relevant information to the U.S. Probation Office for use in preparing a presentence report.

14. *Sentence to be Decided by Judge -- No Promises.* This Plea Agreement is entered pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure. Defendant understands that the final sentence, including the application of the Sentencing Guidelines and any upward or downward departures, is within the sole discretion of the sentencing judge, and that the sentencing judge is not required to accept any factual or legal stipulations agreed to by the parties. Any estimate of the possible sentence to be imposed, by a defense attorney or the Government, is only a

prediction, and not a promise, and is not binding. Therefore, it is uncertain at this time what Defendant's actual sentence will be.

15. *No Right to Withdraw Plea.* Defendant understands that he will have no right to withdraw his plea if the sentence imposed, or the application of the Sentencing Guidelines, is other than what he anticipated, or if the sentencing judge declines to follow the parties' recommendations.

### E. LIMITED SCOPE OF AGREEMENT

16. *Limited Scope of Agreement.* This agreement does not limit, in any way, the right or ability of the Government to investigate or prosecute defendant for crimes occurring outside the scope of this agreement. Additionally, this agreement does not preclude the Government from pursuing any civil or administrative matters against defendant, including, but not limited to, civil tax matters and civil forfeiture which arise from, or are related to, the facts upon which this investigation is based.

17. *Agreement Limited to Southern District of Iowa.* This plea agreement is limited to the United States Attorney's Office for the Southern District of Iowa, and cannot bind any other federal, state or local prosecuting, administrative, or regulatory authorities.

18. *Immigration Consequences of Defendant's Guilty Plea.* Defendant has discussed with his attorney the impact of his guilty plea on the defendant's immigration status if Defendant is not a citizen of the United States. Defendant specifically understands that his guilty plea may restrict his ability to challenge his removal from the United States in the future, and that Defendant may be subject to

immediate removal from the United States following the service of his sentence. Defendant further understands that he is pleading guilty to an "aggravated felony," which means that Defendant would be subject to enhanced criminal penalties if Defendant were to reenter the United States without authorization.

## F. WAIVER OF TRIAL RIGHTS - WAIVER OF APPEAL & § 2255

19. *Trial Rights Explained.* Defendant understands that by entering a plea of guilty he waives the right to:

> (a) continue to plead not guilty and require the Government to prove the elements of the crime beyond a reasonable doubt;
>
> (b) a speedy and public trial by jury, which must unanimously find the defendant guilty before there can be a conviction;
>
> (c) the assistance of an attorney at all stages of trial and related proceedings, to be paid at government expense if defendant cannot afford to hire an attorney;
>
> (d) confront and cross-examine adverse witnesses;
>
> (e) present evidence and to have witnesses testify on behalf of defendant, including having the court issue subpoenas to compel witnesses to testify on the defendant's behalf;
>
> (f) not testify or have any adverse inferences drawn from the failure to testify (although defendant also has the right to testify, if defendant so chooses); and
>
> (g) if defendant is convicted, the right to appeal, with the assistance of an attorney, to be paid at government expense if defendant cannot afford to hire an attorney.

20. *Waiver of Appeal and Post-Conviction Review.* Defendant knowingly and expressly waives any and all rights to appeal his conviction in this case, including a waiver of all motions, defenses and objections which he could assert to the charges or

to the court's entry of judgment against him; except that both Defendant and the United States preserve the right to appeal any sentence imposed by the district court, to the extent that an appeal is authorized by law. Also, Defendant knowingly and expressly waives any and all rights to contest his conviction in any post-conviction proceedings, including any proceedings under 28 U.S.C. § 2255. These waivers are full and complete, except that they do not extend to the right to appeal or seek post-conviction relief based on grounds of ineffective assistance of counsel or prosecutorial misconduct. These waivers also do not preclude Defendant from seeking relief under 28 U.S.C. § 2255 based on any change in the law deemed to be retroactive as a matter of law as determined by the Courts, as a matter of express statutory language enacted by the Congress, or as a matter of policy as determined by the United States Department of Justice.

## G. VOLUNTARINESS OF PLEA & OPPORTUNITY TO CONSULT WITH COUNSEL

21. *Voluntariness of Plea.* Defendant represents that his decision to plead guilty is his own, voluntary decision, and that the following is true:

(a) Defendant has had a full opportunity to discuss all the facts and circumstances of this case with his attorney, and he has a clear understanding of the charges and the consequences of this guilty plea, including the maximum penalties provided by law.

(b) No one has made any promises or offered any rewards in return for this guilty plea, other than those contained in this written agreement.

(c) No one has threatened Defendant or his family to induce this guilty plea.

(d) Defendant is pleading guilty because in truth and in fact he is guilty and for no other reason.

22. *Consultation with Attorney*. Defendant has discussed this case and this plea with his attorney and states that the following is true:

(a) Defendant states that he is satisfied with the representation provided by his attorney.

(b) Defendant has no complaint about the time or attention his attorney has devoted to this case nor the advice she has given.

(c) Although defendant's attorney has given the defendant advice on this guilty plea, the decision to plead guilty is Defendant's own decision. Defendant's decision to enter this plea was made after full and careful thought, with the advice of his attorney, and with a full understanding of his rights, the facts and circumstances of the case, and the consequences of the plea.

## H. ENTIRE AGREEMENT – EFFECTIVE DATE – PUBLIC INTEREST

23. *Entire Agreement*. This plea agreement, and any attachments, is the entire agreement between the parties. Any modifications to this Plea Agreement must be *in writing* and signed by all parties.

24. *Public Interest*. The parties state this plea agreement is in the public interest and it takes into account the benefit to the public of a prompt and certain disposition of the case and furnishes adequate protection to the public interest and is in keeping with the gravity of the offense and promotes respect for the law.

25. *Execution/Effective Date*. This Plea Agreement does not become valid and binding until executed by each of the individuals (or their designated representatives) shown below.

## I. SIGNATURES

26. *Defendant.* I have read all of this Plea Agreement and have discussed it with my attorney. I fully understand the Plea Agreement and accept and agree with it without reservation. I do this voluntarily and of my own free will. No promises have been made to me other than the promises in this Plea Agreement. I have not been threatened in any way to get me to enter into this Plea Agreement. I am satisfied with the services of my attorney with regard to this Plea Agreement and other matters associated with this case. I am entering into this Plea Agreement and will enter my plea of guilty under this Agreement because I committed the crime to which I am pleading guilty. I know that I may ask my attorney and the judge any questions about this plea agreement, and about the rights that I am giving up, before entering into the plea of guilty.

8/13/15                                    Jaime Moran Jaques
Date                                       Jaime Jacquez Moran

27. *Defendant's Attorney.* I have read this Plea Agreement and have discussed it in its entirety with my client. There is no Plea Agreement other than the Agreement set forth in this writing. My client fully understands this Plea Agreement. I am satisfied my client is capable of entering into this Plea Agreement, and does so voluntarily of defendant's own free will, with full knowledge of defendant's legal rights, and without any coercion or compulsion. I have had full access to the Government's discovery materials, and I believe there is a factual basis

for the plea. I concur in my client entering into this Plea Agreement and in entering a plea of guilty pursuant to the Plea Agreement.

8/13/15
Date

Jonathan B. Hammond
Attorney for defendant
Klinger, Robinson & Ford, LLP
401 Old Marion Road NE
Cedar Rapids, Iowa 52402-0020
Tel: (319) 395-7400
Fax: (319) 395-9041
Email: jhammond@krflawfirm.com

28. *United States.* The Government agrees to the terms of this Plea Agreement.

Nicholas A. Klinefeldt
United States Attorney

8/21/2015
Date

By: Clifford R. Cronk III
Assistant United States Attorney
131 East Fourth Street, Suite 310
Davenport, Iowa 52801
Tel: (563) 449-5432
Fax: (563) 449-5433
Email: cliff.cronk@usdoj.gov

15